UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SANJAY CHANDRA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| KINLEY FORD, LLC, GEORGE D. | § | CIVIL ACTION NO. 4:24-cv-00760-O |
| MANDERBACH, INC., GDM | § | |
| LEASING, INC., KINLEYCO. | § | |
| VENTURES, INC., AND STEVEN | § | |
| KAHLON | § | |
| | § | |
| *Defendants*. | § | |

## AMENDED NOTICE OF REMOVAL BASED ON IMPROPER JOINDER

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

George D. Manderbach, Inc., and GDM Leasing, Inc., Petitioners for removal herein (collectively "Petitioners"), hereby petition this Court pursuant to 28 U.S.C. §§ 1332, 1441 and 1446 to remove this action from the 17th District Court of Tarrant County, Texas,[1] to the United States District Court for the Northern District of Texas, Fort Worth Division, the Court for the District and Division encompassing the place where the lawsuit is currently pending, and in support, would respectfully show the Court the following:

## I.
### SUMMARY

1.      In what is clearly an attempt to defeat diversity jurisdiction and litigate his tenuous claims in what he perceives to be a more friendly state forum, the Plaintiff, Sanjay Chandra

---

[1] In their Notice of Removal filed on August 9, 2024 [Dkt. 1], Petitioners stated that the underlying state court action was filed in the 352nd District Court of Tarrant County, Texas.  This was a typographical error. The state court action is pending in the 17th District Court of Tarrant County, Texas. Thus, Petitioners file this Amended Notice in an abundance of caution to correct the typographical error.

("Chandra"), a Tarrant County resident, has sued a shell, Texas entity called Kinley Ford, LLC ("Kinley Ford") – along with a Pennsylvania resident and three Pennsylvania entities – in the 17th Judicial District Court of Tarrant County, Texas, despite the fact that Kinley Ford has ***never*** owned any assets, has ***never*** made any income, has ***never*** made a distribution, and is nothing more than a dormant, shell entity, unutilized by the parties. Despite this fact, Mr. Chandra has asserted a frivolous cause of action against Kinley Ford for breach of an alleged "Term Sheet" that, incredibly, Kinley Ford was not a party to, and is also seeking a declaratory judgment declaring that Mr. Chandra is a 50% owner of this shell entity, and entitled to "millions of dollars" in distributions that Kinley never made.

2.      As set forth below, such allegations are a work of fiction, not only lacking any semblance of evidentiary support, but also completely belied and contradicted by the evidence that is included with this Notice of Removal. Fifth Circuit authority is clear that a plaintiff such as Mr. Chandra may not improperly join a non-diverse defendant in an attempt to defeat the Court's jurisdiction to hear the claim. *Flagg v. Stryker Corp.*, 819 F.3d 132, 136 (5th Cir. 2016). A non-diverse defendant is improperly joined when the Plaintiff is unable to establish a cause of action against the non-diverse party in state court. *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc). Moreover, where a plaintiff is alleged to have misstated or omitted discrete facts that would determine the propriety of joinder, as here, the district court, may, in its discretion, pierce the pleadings and conduct a summary judgment-type analysis to identify discrete facts that would preclude recovery against the non-diverse defendant. *Id*. at 573-74. Such is the case here. Mr. Chandra has misstated or omitted discrete facts from his Petition that would determine the propriety of his joinder of Kinley Ford in the state court action. As set forth below, and in the evidence included with this Notice, Mr. Chandra has no valid claim against Kinley Ford

for breach of contract or declaratory relief.  It should therefore be dismissed from this law and this Court should exercise subject matter jurisdiction over the remaining diverse defendants.

## II.
### PARTIES AND STATUS OF STATE COURT ACTION

3.      The above action was commenced by Mr. Chandra in the 17th Judicial District Court of Tarrant County, Texas, Cause No. 017-352178-24, on or about April 23, 2024. According to Plaintiff's Original Petition, the amount in controversy exceeds $1 million. Petitioners are defendants in the underlying state court action who were served on or about July 17, 2024 by agreement, and whose answers are due in the state court action on August 12, 2024. Mr. Kahlon, one of the co-defendants in the state court action, filed his answer in the 17th District Court on or about June 10, 2024. KinleyCo Ventures, LLC ("KinleyCo"), another co-defendant in the state court action, was served in June of 2024, and filed its answer in the 17th District Court on or about July 8, 2024.

4.      Thus, this Notice of Removal is timely filed under 28 U.S.C. §1446(b) because it is filed within 30 days of the receipt by the Petitioners of a copy of the initial pleading setting forth the claim for relief upon which such action is based. 28 U.S.C. §1446(b). The above entitled suit is a civil action initiated by Mr. Chandra against Petitioners, among others, to recover damages allegedly resulting from the breach of various agreements.  Mr. Chandra has also asserted a claim for fraud, and seeks a declaratory judgment regarding his purported ownership interest in the various dealer entities.

5.      The parties and their counsel in the underlying state court action are as follows:

a)      Plaintiff

Sanjay Chandra
c/o Brian H. Oates
State Bar No. 24088144

Michael Murtha
State Bar No. 11031400
JACKSON WALKER L.L.P.
2323 Ross Avenue, Ste. 600
Dallas, Texas 75201
(214) 953-6000
(214) 953-5822 – Fax
Email: boates@jw.com
Email: mmurtha@jw.com

b)      Defendants

KinleyCo. Ventures, Inc.
Steven Kahlon
Kinley Ford, LLC
George D. Manderbach, Inc.
GDM Leasing, Inc.
c/o Brandon L. Starling
State Bar No. 24047556
Susan G. White
State Bar No. 00788658
WHITE, STARLING & OSTERMAN, PLLC
2003 N. Lamar Blvd., Suite 100
Austin, Texas 78705
Phone: 512-559-6461
Facsimile: 512-791-9764
bstarling@wso-law.com
swhite@wso-law.com

## III.
### INDEX OF STATE COURT DOCUMENTS

5.      Pursuant to 28 U.S.C. §1446(a), Petitioners attached the pleadings in the underlying

state court action to the August 9, 2024 Notice of Removal, including:

| Document | Date Filed |
|---|---|
| 1.   Court's Docket Sheet | |
| 2.   Plaintiff's Original Petition | 4/23/24 |
| 3.   Plaintiff's Motion for Substituted Service of Process | 5/08/24 |
| 4.   Order Granting Plaintiff's Motion for Substituted Service of Process on Steven Kahlon | 5/16/24 |

| 5. | Affidavit of Service on Steven Kahlon | 5/20/24 |
|---|---|---|
| 6. | Return of Service on Steven Kahlon | 5/20/24 |
| 7. | Defendant Steven Kahlon's Answer to Plaintiff's Original Petition | 6/10/24 |
| 8. | Return of Service on KinleyCo Ventures, Inc. | 6/13/24 |
| 9. | Defendant KinleyCo Ventures, Inc.'s Answer to Plaintiff's Original Petition | 7/08/24 |
| 10. | Unopposed Motion for Withdrawal and Substitution of Counsel | 7/24/24 |
| 11. | Order Granting Unopposed Motion for Withdrawal and Substitution of Counsel | 7/29/24 |
| 12. | Return of Service – Notice of Subpoena Duces Tecum to Ford Motor Credit Company, LLC to Produce Documents, Information or Objects and Subpoena for Production of Documents, Subpoena to Produce Documents, Information or Objects | 8/01/24 |
| 13. | Return of Service – Notice of Subpoena Duces Tecum to Ford Motor Company to Produce Documents, Information or Objects and Subpoena for Production of Documents, Subpoena to Produce Documents, Information or Objects | 8/02/24 |
| 14. | Return of Service – Notice of Subpoena Duces Tecum to First Commonwealth Bank to Produce Documents, Information or Objects and Subpoena for Production of Documents, Subpoena to Produce Documents, Information or Objects | 8/02/24 |
| 15. | Affidavit of Service – Notice of Subpoena Duces Tecum to General Motors to Produce Documents, Information or Objects and Subpoena for Production of Documents, Subpoena to Produce Documents, Information or Objects | 8/05/24 |
| 16. | Return of Service – Notice of Subpoena Duces Tecum to Will Churchill for General Motors to Produce Documents, Information or Objects and Subpoena for Production of Documents, Subpoena to Produce Documents, Information or Objects | 8/05/24 |

**IV.**
**E**VIDENCE IN **S**UPPORT OF **R**EMOVAL

6.      In support of this Amended Notice of Removal, Petitioners rely on the evidence

that was previously attached to Petitioners' Notice of Removal filed on August 9, 2024 [Dkt. 1],

including:

- Affidavit of Steven Kahlon, a true and correct copy of which is attached hereto as Exhibit B;

  - Promissory Note dated December 10, 2019, a true and correct copy of which is attached hereto as Exhibit B-1;

  - Manderbach Ford Investor Term Sheet, a true and correct copy of which is attached hereto as Exhibit B-2;

  - Kinley Ford Operating Agreement dated November 21, 2019, a true and correct copy of which is attached hereto as Exhibit B-3;

  - Certificate of Conversion, a certified copy of which is attached hereto as Exhibit B-4;

  - May 2, 2022 email chain, a true and correct copy of which is attached hereto as Exhibit B-5;

  - Promissory Note dated April 21, 2023, a true and correct copy of which is attached hereto as Exhibit B-6;

  - Reinstatement of Corporate Charter, a certified copy of which is attached hereto as Exhibit B-7;

  - November 9, 2022 Public Information Report, a certified copy of which is attached hereto as Exhibit B-8;

  - Schedule K-1, a true and correct copy of which is attached hereto as Exhibit B-9;

  - March 12, 2024 email from Mr. Chandra to Mr. Kahlon, a true and correct copy of which is attached hereto as Exhibit B-10; and

  - February 6, 2024 email, a true and correct copy of which is attached hereto as Exhibit B-11.

    o   Alleged "Kinley Ford Term Sheet," a true and correct copy of which is attached hereto as Exhibit B-12.

## V.
### BACKGROUND FACTS

### The parties and the dealerships

7.     Mr. Kahlon is a resident of Pennsylvania, and the dealer principal of several successful franchised dealerships located in the State of Pennsylvania, including the dealerships at issue in this action. *See* Kahlon Affidavit, Ex. B. Specifically, Mr. Kahlon is the dealer principal of Manderbach Ford, a Ford-franchised dealership located in Hamburg, Pennsylvania. *Id*. Manderbach Ford is owned by Petitioner George D. Manderbach, Inc. ("Manderbach Inc."), a Pennsylvania corporation with its principal place of business in Hamburg, Pennsylvania. *Id*.; *see also* Plaintiff's Original Petition, Ex. A-1. Manderbach Inc. is owned by Teton Group, LLC ("Teton Group"), a Pennsylvania limited liability company. *See* Kahlon Affidavit, Ex. B.

8.     Mr. Kahlon is also the dealer principal of Whitmoyer Ford, a Ford-franchised dealership located in Mount Joy, Pennsylvania. *Id*. Whitmoyer Ford is owned by Whitmoyer Ford, Inc., a Pennsylvania corporation with its principal place of business in Mount Joy, Pennsylvania. *Id*. Mr. Kahlon is also the dealer principal of Whitmoyer Chevrolet, a Chevrolet-franchised dealership located in Mount Joy, Pennsylvania. *Id*. Whitmoyer Chevrolet is owned by Whitmoyer Buick Chevrolet, Inc., a Pennsylvania corporation with its principal place of business in Mount Joy, Pennsylvania. *Id*. And both Whitmoyer Ford, Inc. and Whitmoyer Buick Chevrolet, Inc., are owned by Petitioner KinleyCo Ventures, Inc. ("KinleyCo"), a Pennsylvania corporation with its principal place of business in Hamburg, Pennsylvania. *Id*.; *see also* Plaintiff's Original Petition, Ex. A-1. Mr. Kahlon is the sole shareholder of Kinley Co. Kahlon Affidavit, Ex. A. Mr. Kahlon is also the sole shareholder of Petitioner GDM Leasing, Inc. ("GDM Leasing"), a Pennsylvania

corporation with its principal place of business in Hamburg, Pennsylvania. *See* Kahlon Affidavit, Ex. B; *see also* Plaintiff's Original Petition, Ex. A-1.

### The purchase of Manderbach Ford

9.      In 2019, Ford Motor Company ("Ford") approached Mr. Kahlon about purchasing a struggling Ford dealership located in Hamburg, Pennsylvania, known as Manderbach Ford. Kahlon Affidavit, Ex. B. At the time, the dealership was performing poorly, and Ford wanted to significantly increase its volume of sales. Thus, given Mr. Kahlon's success with other Ford-franchised dealerships, Ford proposed that Mr. Kahlon purchase Manderbach Ford. *Id*. However, Mr. Kahlon did not have the requisite funds to purchase the dealership at that time, and needed a funding source to loan him approximately $1.4 million. *Id*.

10.     Thus, Mr. Kahlon heard about Mr. Chandra – an individual and private equity lender located in Southlake, Texas – through several acquaintances, and decided to approach Mr. Chandra for a loan. *Id*. After discussing the potential transaction at length with Mr. Kahlon, Mr. Chandra represented to Mr. Kahlon that he had always wanted to be a part of the automobile dealer industry, and had significant financial resources to fund any future deals. Mr. Chandra represented that with his lending prowess, and Mr. Kahlon's knowledge and experience in the automobile dealer industry, the two of them might explore future dealership opportunities together. *Id*. Mr. Kahlon, intrigued by Mr. Chandra's representations and the prospect of Mr. Chandra funding future deals, decided to use Mr. Chandra as the funding source for the Manderbach transaction, despite the unfavorable terms proposed by Mr. Chandra. *Id*. Specifically, the loan included 18% interest, and was to be secured by the assets of GDM Leasing.

11.     Thus, Mr. Chandra and/or his agents drafted a Promissory Note dated December 10, 2019 evidencing the $1.4 million loan (the "Note"), and forwarded same to Mr. Kahlon for

signature. *See* Note, Ex. B-1. Pursuant to the terms of the Note, Mr. Chandra's Texas limited partnership, Chandraco, LP ("Chandraco") – *and **not** Mr. Chandra* – was the lender of the $1.4 million, and Mr. Kahlon, Teton Group, and GDM Leasing (and not Manderbach, Inc.) were the borrowers. *Id.* Mr. Kahlon executed the Note on behalf of Teton Group and himself, and George D. Manderbach executed the Note on behalf of GDM Leasing. *Id.* And Mr. Kahlon, Teton Group, and GDM Leasing timely repaid the loan plus interest to Chandraco. *See* Kahlon Affidavit, Ex. B.

### The draft "Manderbach Ford Investor Term Sheet"

12.     Around that same period, Mr. Chandra prepared a draft term sheet that he entitled, "Manderbach Ford Investor Term Sheet" (the "Term Sheet"), and forwarded same to Mr. Kahlon. *See* Terms Sheet, Ex. B-2. Pursuant to the draft Term Sheet, which states underneath the title, "(**Draft- subject to review by Investor's counsel**)," Mr. Chandra referenced a $1.4 million loan from Chandraco to "Manderbach Ford and GDM Leasing" (despite the fact Manderbach was not one of the borrowers), and also included additional consideration in what was clearly an attempt to avoid Texas' usury laws. Specifically, Mr. Chandra's Term Sheet stated that in exchange for the $1.4 million loan, Investor "Sanjay Chandra or an affiliated entity (most likely Chandraco LP or Chandra Management Trust)" was entitled to an additional $600,000 "preferred return" from Manderbach Ford and/or GDM Leasing, as well as a "15% equity ownership or profits interest" in Manderbach Ford. *Id.* The Term Sheet further provided that Mr. Chandra was entitled to profits sharing, and the use of demo automobiles. *Id.* However, Mr. Chandra's draft Term Sheet provided that this "additional consideration is subject to change if Investor is required or requested to loan or invest additional funds at any time." *Id.*

13.     Given Mr. Chandra's repeated representations and assurances that he had the ability to fund any future deals and was interested in purchasing additional dealerships with Mr. Kahlon,

Mr. Kahlon signed the draft Term Sheet, and forwarded same to Mr. Chandra. *See* Kahlon Affidavit, Ex. B. However, Mr. Chandra sat on the draft Term Sheet, did not execute it at that time and – more importantly – never forwarded Mr. Kahlon a formal contract that included such terms. *Id*. Thus, there was *never* any contract between Mr. Chandra and Mr. Kahlon (nor anyone else) that included the terms set forth in the draft Term Sheet. As Mr. Kahlon would eventually learn, this was Mr. Chandra's *modus operandi* – promising the world, and then failing and refusing to live up to his representations when the time came for him to sign on the dotted line. Nevertheless, in an effort to show Mr. Chandra that he remained interested in doing business with him in the future, Mr. Kahlon agreed to provide various demo vehicles to Mr. Chandra for use by Mr. Chandra and his family, beginning in 2020 and continuing to this day. *Id*.

### Kinley Ford, LLC is formed

14.     In November of 2019, Mr. Kahlon formed a single member Pennsylvania limited liability company known as Kinley Ford LLC. *Id*. Kinley was the name of Mr. Kahlon's daughter, and he anticipated that he could use the LLC for future acquisitions. *Id*. Mr. Kahlon signed the Kinley Ford Operating Agreement on or about November 21, 2019. *See* Operating Agreement, Ex. B-3. As reflected in the Operating Agreement, Mr. Kahlon was the "sole member" and manager of Kinley Ford.  *Id*. However, on or about September 18, 2020, Mr. Kahlon converted Kinley Ford into a Texas limited liability company at Mr. Chandra's insistence, as Mr. Chandra demanded that Kinley Ford be converted to a Texas entity if they were going to do any future deals. *See* Kahlon Affidavit, Ex. B. Mr. Chandra and/or his agents prepared the Certificate of Conversion and filed same with the Texas Sec. of State. Ex. B-4. However, Kinley Ford remained just a single member, shell entity, with no assets or income. *See* Kahlon Affidavit, Ex. B.

**The Purchase of Whitmoyer Ford and Whitmoyer Chevrolet**

15.    Over the course of the next two years, Mr. Kahlon and Mr. Chandra continued to discuss potential deals, but nothing ever materialized. *Id.* Finally, in the Spring of 2022, Mr. Kahlon learned that Whitmoyer Ford, a Ford-franchised dealership located in Mount Joy, Pennsylvania, and Whitmore Chevrolet, a Chevrolet-franchised dealership also located in Mount Joy, Pennsylvania, were for sale. *Id.* When Mr. Kahlon informed Mr. Chandra of this opportunity, Mr. Chandra represented in no uncertain terms that he would fund the deal, as he wanted to be a part owner in each of the dealerships. *Id.* Thus, Mr. Kahlon – relying on Mr. Chandra's representations – paid an approximate $1.4 million deposit toward the purchase of the dealerships out of his own pocket, and commenced negotiations with the seller. *Id.* Mr. Kahlon also advised Mr. Chandra once again that if he wanted to be a part owner in the dealerships, then he would need to immediately submit an application to both Ford and General Motors, and obtain their approval. *Id.* While Mr. Chandra promised Mr. Kahlon he would do so, Mr. Chandra once again dragged his feet, failing to fill out the requisite applications. *Id.*

16.    After waiting several weeks for Mr. Chandra to submit his applications to the manufacturers, and with the funding of the deal and Mr. Kahlon's cash deposit now in jeopardy, Mr. Kahlon reached out to General Motors on Mr. Chandra's behalf on May 2, 2022 in order to obtain the necessary paperwork for him to begin the approval process. *Id.* As reflected in the May 2, 2022 email correspondence attached hereto as Exhibit B-5, Mr. Kahlon spoke with a GM representative who forwarded the new dealer application for Mr. Chandra to fill out. *See* Ex. B-5. By email dated May 11, 2022, Mr. Kahlon wrote Mr. Chandra, advising, "You have yet to complete any factory applications or submit. I cannot wait around for you." *Id.* In other words, Mr. Kahlon was advising Mr. Chandra that if he waited any longer to seek approval from the

manufacturers, Mr. Kahlon would have to find an alternative source of funding. *See* Kahlon Affidavit, Ex. B. Despite his repeated warnings, however, Mr. Chandra continued to sit on the requisite applications, failing to complete and submit same. *Id.*

17.     Because of Mr. Chandra's baffling unwillingness to take the necessary steps to obtain manufacturer approval, Mr. Kahlon was forced to look for alternative sources of funding. *Id.* In that regard, Mr. Kahlon approached both Ford Motor Credit and GM Financial, and requested their assistance in obtaining the requisite loans. *Id.* Both Ford Motor Credit and GM Financial offered to loan Mr. Kahlon the necessary funds, so long as Mr. Kahlon personally guaranteed each of the loans. *Id.* Mr. Kahlon agreed to do so, putting his personal assets at risk to get the deals done. *Id.* Although Mr. Kahlon asked Mr. Chandra to likewise guarantee the loans, Mr. Chandra once again failed and refused to do so. *Id.* Despite this fact, both Ford and GM approved the loans, and each of the deals closed on or about April 24, 2023. *Id.*

18.     Despite Mr. Chandra's blatant refusal to take the necessary steps to obtain an ownership interest in each of the dealerships, Mr. Kahlon nevertheless advised Mr. Chandra that 1) if he would contribute $2 million in equity to KinleyCo – the company that owns of each of the dealership entities; 2) if he would personally guarantee repayment of the loans to both Ford and GM; and 3) if he would finally submit his applications to both Ford and GM, and obtain their approval, Mr. Kahlon would agree to give Mr. Chandra a 50% equity interest in KinleyCo. *Id.* Moreover, given the volume of fleet sales that each of the dealerships made to the government, and given the lag time between the transactions and funding, Mr. Kahlon proposed that Mr. Chandra provide what was essentially a bridge loan to KinleyCo., which would be paid back, with interest, once the receivables were received from the government. *Id.*

19.     Mr. Chandra agreed to this arrangement, as reflected in the Promissory Note dated April 21, 2023 (the "4-21-23 Note"). *See* 4-21-23 Note, Ex. B-6. Pursuant to the terms of the 4-21-23 Note, the total amount of the loan was $12,455,796, and Mr. Kahlon agreed to use $2 million from the proceeds of the loan to fund Mr. Chandra's equity contribution to KinleyCo., provided of course that Mr. Chandra 1) guaranteed repayment of the loans to Ford and GM, and 2) applied for and obtained both Ford's and GM's approval. Kahlon Affidavit, Ex. B. However, once again, Mr. Chandra simply failed and refused to do either. *Id*. Thus, KinleyCo continued to pay down the 4-21-23 Note, and on July 25, 2023, Mr. Kahlon reimbursed Mr. Chandra his $2 million equity contribution to KinleyCo. *Id*.

### Mr. Chandra's demand for a 50% equity interest

20.     Despite his unwillingness to submit his dealer application to Ford and GM, and take the necessary steps to obtain an equity intertest in each of the dealerships, in or around late 2023 (presumably after he learned that the dealerships were finally starting to make money), Mr. Chandra contacted Mr. Kahlon to demand his alleged 50% equity interest in KinleyCo, Manderbach, Inc. and GDM Leasing. *Id*. In response to Mr. Chandra's demands, Mr. Kahlon reminded Mr. Chandra that it was Mr. Kahlon who had funded the purchase of Whitmoyer Ford and Whitmoyer Chevrolet by himself, due to Mr. Chandra's failure to submit his applications to both Ford and GM for approval. *Id*. Mr. Kahlon further reminded Mr. Chandra that Mr. Kahlon – unlike Mr. Chandra – had put his personal assets on the line by obtaining and guaranteeing the loans, and that Mr. Chandra had failed and refused to do, despite repeated request. *Id*. Mr. Kahlon also reminded Mr. Chandra that Chandraco's $1.4 million loan used to fund Manderbach Ford' cash management account had been paid in full, at 18% interest.

21.     When Mr. Chandra's bullying tactics failed, he next contacted the dealer entities' Pennsylvania counsel, Stephen Dietrich, demanding that Mr. Dietrich re-draft the various company agreements to reflect that Mr. Chandra was a 50% owner. *Id*. Mr. Dietrich advised Mr. Chandra that he was not listed as having an equity interest on *any* of the company agreements or transaction documents, and that all of the loan documents at issue reflected that Mr. Chandra was a mere lender – albeit, a lender who was paid handsomely for the loans made to the various entities. *Id*.

**Mr. Chandra's scheme to obtain an equity interest in Kinley Ford**

22.     Throughout the course of these events, Kinley Ford, the Texas limited liability company that Mr. Kahlon formed in 2019, remained a dormant shell entity, with no assets, no activity and no income. Kahlon Affidavit, Ex. B.  In fact, Kinley Ford was such an afterthought that Mr. Kahlon forgot to pay its franchise tax in 2022, which resulted in the forfeiture of its corporate charter from May of 2022 until December 9, 2022, when its corporate charter was reinstated, apparently by Mr. Chandra and/or his agents, as Mr. Kahlon was completely unaware that the corporate charter had been forfeited until after the filing of the state court lawsuit. *Id*. Apparently, Mr. Chandra's agents filed an Application for Reinstatement on or about December 9, 2022, which was signed by an individual named "Lesley Hunter," in her capacity as a "Member" of Kinley Ford, despite the fact that she holds no such position. *Id*.; *see also* Reinstatement, Ex. B-7. Ms. Hunter is Mr. Chandra's assistant. Kahlon Affidavit, Ex. B.

23.     Unbeknownst to Mr. Kahlon, in late 2023, Mr. Chandra began to hatch a scheme to obtain a 50% equity interest in the various dealerships. Specifically, in December of 2023 – in what appears to have been an attempt to manufacture a claim to the alleged 50% equity interest – Mr. Chandra secretly filed a Texas Franchise Tax Public Information Report with the Texas Secretary of State wherein he listed himself as one of the members of the shell entity, Kinley Ford.

*See* Public Information Report, Ex. B-8. At the time, Mr. Kahlon was completely unaware of Mr. Chandra's unauthorized actions, and did not learn that he had attempted to install himself as a member of Kinley Ford until after this lawsuit was filed. Kahlon Affidavit, Ex. B. Additionally, although Mr. Kahlon had never filed a tax return on behalf of Kinley Ford in the years since its formation in 2019, given the fact that Kinley Ford had never made any income, approximately a month ago, Mr. Kahlon received a Schedule K-1 from Mr. Chandra for Kinley Ford for the year 2022, which stated that he not only owned a 50% interest in Kinley Ford, but that he had a beginning of the year stock basis of $1,387,261 in Kinley Ford, despite the fact that Mr. Kahlon had not made any capital contributions to Kinley Ford outside of the initial $100 capital contribution when he formed the entity in December of 2019. See K-1, Ex. B-9; Kahlon Affidavit, Ex. B.

**Mr. Chandra files the state court lawsuit**

24.     Mr. Chandra's scheme to manufacture an equity interest in Kinley Ford finally came to fruition on or about April 23, 2024, when Mr. Chandra filed the underlying state court lawsuit, wherein he now alleges, rather remarkably, that Kinley Ford – the dormant shell entity with no assets and no income that lost its corporate charter from May of 2022 until December of 2022 – is actually "the owner of Manderbach and GDM Leasing." *See* Petition, ¶ 20. And in an attempt to perpetuate this ruse, Mr. Chandra goes on to allege that the draft "Manderbach Ford Investor Term Sheet" attached as Exhibit B-2 and that was never reduced to a written contract is actually the "Kinley Ford Term Sheet," and that Mr. Kahlon executed same on behalf of "Kinley Ford," despite the fact that Kinley Ford is mentioned ***nowhere*** in the draft Term Sheet. *See* Ex. B-2.

25.     Moreover, Mr. Chandra goes on to allege that both he *and* Mr. Kahlon signed this "Kinley Ford Term Sheet" on December 5, 2019. *See* Petition, ¶ 20. Curiously, however, in an email dated March 12, 2024, entitled, "Documents in our possession - need help from Dietrich organizing these for Corporate Records - have links to Documents on a Google Drive," Mr. Chandra sent Mr. Kahlon a spreadsheet which allegedly identified all of the documents and agreements drafted by the parties, including the "Manderbach Ford Term Sheet," and who had signed same. And contrary to his representations to 17th District Court in his Original Petition, Mr. Chandra states in the spreadsheet that both he and his entity, Chandraco, "**did not sign**" the draft Term Sheet:

| *Term Sheet* | | | |
|---|---|---|---|
| Manderbach Ford Term Sheet | 12/5/2019 | Yes | Sanjay (Chandraco) did not sign; Steve signed |

*See* Chandra 3-12-24 email, Ex. B-10.

26.     Mr. Chandra goes on to allege in paragraph 21 of his Petition that, "Following the execution of the Kinley Ford Term Sheet, Mr. Chandra and Mr. Kahlon negotiated a company agreement for Kinley Ford, the owner of Manderbach and GDM Leasing," and that on "December 1, 2022, the Kinley Ford Company Agreement was fully executed." *See* Petition, ¶ 21. Yet, in Mr. Chandra's email dated March 12, 2024 to Mr. Kahlon – which purports to include *all* of the documents related to Kinley Ford – Mr. Chandra completely fails to identify this alleged December 1, 2022 Company Agreement. *See* Ex. B-10. In fact, the *only* company agreement mentioned in Mr. Chandra's March 12, 2024 email is a December 1, 2019 Company Agreement that Mr. Chandra represents was signed only by Mr. Kahlon. *Id*. Rather tellingly – the email also states that "**Kinley owns nothing**":

| Kinley Ford Company LLC Agreement | 12/1/2019 | Yes | Singed By Steve Kinley owns nothing |
|---|---|---|---|

*See* Chandra 3-12-24 email, Ex. B-10. Thus, despite the fact that Mr. Chandra alleges this purported Company Agreement was "fully executed" on December 1, 2022, oddly, his March 12, 2024 email more than a year later does not even mention it. Moreover, after the filing of this lawsuit, Mr. Chandra produced this alleged Kinley Ford Company Agreement, which neither Mr. Kahlon nor his corporate attorneys had ever seen prior to its production. Kahlon Affidavit, Ex. B. Interestingly, despite allegedly being fully-executed on December 1, 2022, the alleged agreement contained an address for Mr. Kahlon that he hasn't lived at in approximately 10 years. *Id*.

27.     Mr. Chandra goes on to allege that "[u]nder the Company Agreement, Mr. Chandra's equity interest in Kinley Ford was increased to 50%, with both Mr. Chandra and Mr. Kahlon making equal capital commitments of $1,387,261," and that "[s]ince Mr. Chandra executed the Kinley Ford Term Sheet and Kinley Ford Company Agreement, Mr. Kahlon has paid himself millions in distributions from Kinley Ford without abiding by the pro rata terms and paying Mr. Chandra equally." *See* Petition, ¶ 22. Yet, in his March 12, 2024 email to Mr. Kahlon, Mr. Chandra 1) failed to identify the purported December 1, 2022 Company Agreement, 2) represented that he "did not sign" the draft Term Sheet, 3) identified only a December 1, 2019 Company Agreement that was "signed by Steve only"; and 4) and represented that "Kinley owns nothing." Indeed, neither Mr. Chandra nor Mr. Kahlon has *ever* paid a penny in "capital commitments" to Kinley Ford, outside of Mr. Kahlon's initial $100 capital contribution. *See* Kahlon Affidavit, Ex. B. Nor has Kinley Ford – an entity that Mr. Chandra acknowledged in March of 2024 "owns nothing" – ever made a distribution, much less paid "millions in distributions." *Id*. Nevertheless, this ruse, as well as the manufactured documents created by Mr. Chandra in furtherance of this ruse, allowed Mr. Chandra to assert a claim against a state court entity that owns nothing, and has distributed nothing since its inception in 2019.

28.     It is worth noting that when Mr. Kahlon first read the false allegations included in Mr. Chandra's Petition, he recalled Mr. Chandra's March 12, 2024 email proving the falsity of the allegations. *Id.* However, when he went to look for the email in question, he was unable to locate it. *Id.* Indeed, although Mr. Kahlon did not delete the email, it was nowhere to be found, either in Mr. Kahlon's inbox, in his sent items (Mr. Kahlon had forwarded the email to his attorney) or in his deleted items. *Id.* Thus, Mr. Kahlon contacted his attorney, Paul Stewart, to determine if Mr. Stewart still had a copy, and Mr. Stewart forwarded the attached email and confirmed he had received same from Mr. Kahlon on June 24, 2024. *Id.* It is highly likely that the email in question was deleted by Kinley Auto Group's former Chief Financial Officer, Prabh Singh, who Petitioners have recently learned was secretly transmitting Petitioners' documents to Mr. Chandra, without permission or acknowledgement, in what is believed to be an attempt to bolster Mr. Chandra's claims.

29.     Specifically, although a forensic investigation is currently being conducted, several eyewitnesses saw Mr. Singh using Mr. Kahlon's laptop while Mr. Kahlon was out of the office. *Id.* Moreover, Petitioners' IT department was able to locate an email from Mr. Singh to Mr. Chandra dated February 6, 2024, wherein Mr. Singh forwarded Mr. Sanjay an organizational chart, and stated: "We need to get Dietrick [sic] to update this as the documents are corrected. Please don't tell Steve I sent this to you."

**From:** Prabh Singh <prabhsingh@kinleyautomotive.com>
**Sent:** Tuesday, February 6, 2024 7:06 PM
**To:** Sanjay Chandra <Sanjay@trinityinvestors.com>
**Subject:** Org Chart

We need to get Dietrick to update this as the documents are corrected. Please don't tell Steve I sent this to you.

Thank You

**Prabh Singh**
CFO | www.KinleyAutoGroup.com

T: (484) 650-4559
E: PrabhSingh@KinleyAutomotive.com
A: Kinley Automotive Group, 301 Front St, Hamburg PA, 19526



*See* Singh 2-6-24 email, Ex. B-11. Given that Mr. Chandra was advising Mr. Kahlon and his attorney, Mr. Dietrich, during this same period that the various company agreements needed to be revised to reflect that Mr. Chandra was a 50% owner of each of the entities, it appears clear that Mr. Singh was secretly transmitting Petitioners documents, without permission or acknowledgement, to bolster Mr. Chandra's claims.

## VI.
### GROUNDS FOR REMOVAL

**A.    Legal standard for improper joinder.**

30.    The improper-joinder doctrine is an exception to the general rule that parties must be completely diverse for federal courts to exercise subject matter jurisdiction under 28 U.S.C. § 1332. *McDonal v. Abbott Labs.*, 408 F.3d 177, 183 (5th Cir. 2005). Under this doctrine, the court may disregard the citizenship of an improperly joined, non-diverse defendant, dismiss that defendant from the case, and exercise subject matter jurisdiction over the remaining diverse

defendants. *Flagg v. Stryker Corp.*, 819 F.3d 132, 136 (5th Cir. 2016). The removing party bears the burden of proving improper joinder, *Cuevas v. BAC Home Loans Servicing, LP,* 648 F.3d 242, 249 (5th Cir. 2011), and can establish it in two ways: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc) (quoting *Travis v. Irby,* 326 F.3d 644, 646–47 (5th Cir. 2003)). To make the second showing, a defendant must demonstrate that "there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Id.*

31.     There are two methods of determining whether the plaintiff could possibly recover against the non-diverse defendant: (1) conduct a Rule 12(b)(6)-type analysis, looking to the face of the complaint to assess whether it states a claim against the non-diverse defendant; or (2) pierce the pleadings and conduct a summary judgment-type analysis to identify discrete facts that would preclude recovery against the non-diverse defendant. *Smallwood*, 385 F.3d 568, 573-74; *Yarco Trading Co., Inc. v. United Fire & Cas. Co.*, 397 F. Supp. 3d 939, 944 (S.D. Tex. 2019). The latter method is applicable when the plaintiff has stated a claim against the non-diverse defendant, but summary-judgment evidence reveals misstated or omitted facts relevant to the propriety of joinder. *Id.* In conducting such an inquiry, the district court may consider summary judgment-type evidence in the record, but must also take into account all unchallenged factual allegations, including those alleged in the complaint, in the light most favorable to the plaintiff. *Bayou Acquisitions, LLC v. Badger Daylighting Corp.,* No. 22-4541, 2023 WL 2367440, at *3 (E.D. La. Mar. 6, 2023).

**B.      Mr. Chandra is unable to establish a cause of action against Kinley Ford, and as such, the Court should dismiss Kinley Ford from the case, and exercise subject matter jurisdiction over the remaining diverse defendants.**

32.      It is clear from the evidence included with this Notice of Removal that Mr. Chandra is unable to establish a cause of action against Kinley Ford.  Mr. Chandra has asserted the following Texas causes of action against Kinley Ford: 1) breach of the "Kinley Ford Term Sheet," and 2) declaratory judgment.[2] When considering the evidence included with this Notice, neither of Mr. Chandra's claims withstand scrutiny. As set forth below, his claims for breach of contract and declaratory relief should therefore be dismissed, and the Court should exercise subject matter jurisdiction over the remaining defendants.

**1.      Mr. Chandra's cannot establish a claim for breach of the "Kinley Ford Term Sheet" against Kinley Ford.**

33.      In his Original Petition, Mr. Chandra alleges that he had a "valid, enforceable contract" with Kinley Ford, the "Kinley Ford Term Sheet." Mr. Chandra further alleges that Kinley Ford has "breached the Kinley Ford Term Sheet by, among other things, failing to pay Mr. Chandra the $600,000 preferred return set forth in the parties' agreement, failing to pay distributions he was owed under the minimum annual distribution clause, and failing to pay any distributions owed to him pursuant to his 15% equity interest in Manderbach before December 1, 2022."

34.      In order to prevail on his claim for breach of the Kinley Ford Term Sheet against Kinley Ford, Mr. Chandra must establish the following elements: 1) Mr. Chandra had a valid, enforceable contract with Kinley Ford; 2) Mr. Chandra performed, tendered performance or was excused from performing his contractual obligations; 3) Kinley Ford breached the contract; and 4) Kinley Ford's breach caused Mr. Chandra's injuries. *B&W Sup. v. Beckman*, 305 S.W.3d 10, 16

---

[2] Although Mr. Chandra has asserted additional claims in the underlying state court action, none of those claims were against Kinley Ford. *See* Original Petition.

(Tex. App.—Houston [1st Dist.] pet denied). With respect to the first element, a party must establish the existence of a contractual relationship, or privity, between the parties in order to prevail on a breach of contract claim. *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 912 (Tex. App.—Dallas 2008, no pet.) (privity is an essential element for recovery in any action based on contract). Maintenance of an action for breach of contract requires privity between the party damaged and the party sought to be held liable. *Jensen Construction Co. v. Dallas County*, 920 S.W.2d 761, 772 (Tex. App.—Dallas 1996, writ denied). Privity of contract is established by proving that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff. *Conquest Drilling Fluids v. Tri-Flo Int'l, Inc.,* 137 S.W.3d 299, 308 (Tex. App.—Beaumont 2004, no pet.).

35.     In this case, the evidence included with this Notice of Removal clearly and unequivocally establishes that Mr. Chandra cannot even get past the first element – privity of contract between himself and Kinley Ford. Specifically, a review of the draft "Kinley Ford Term Sheet" (as Mr. Chandra conveniently calls it) that Mr. Chandra produced in the state court action will reveal that Kinley Ford is listed ***nowhere*** on the alleged term sheet. In fact, the alleged term sheet produced by Mr. Chandra, which is attached hereto as Exhibit B-2, is actually titled the "Manderbach Ford Investor Term Sheet (Draft- subject to review by Investor's counsel)":

## Manderbach Ford Investor Term Sheet
## (Draft – subject to review by Investor's counsel)

*See* Ex. B-12. Moreover, the parties to the alleged term sheet are Manderbach Inc., GDM Leasing, Inc., and unnamed and unidentified "affiliated entities if utilized for this transaction." *Id*. Again, Kinley Ford is not listed as a party to the draft term sheet. In fact, incredibly, the alleged draft term sheet does not even identify who the other party to the term sheet is, stating that the "Investor" is

"Sanjay Chandra **or** an affiliated entity (most likely Chandraco LP or Chandra Management Trust)." *Id*. (emphasis added). Thus, while it is entirely unclear who the actual parties to the alleged term sheet are, what is clear is that Kinley Ford is ***not*** a party to the alleged term sheet.

36.     And even if it were, a mere "draft" term sheet, subject to revision by Mr. Chandra (or an affiliated entity) is simply not a valid and enforceable contract under Texas law. In order to be valid and enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 345 (Tex. 1955)). Essential terms are reasonably certain and definite when they convey both that the "parties actually intended to be contractually bound[ ]" and "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Fischer*, 479 S.W.3d at 237 (citation omitted); *FFSS v. Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.—Fort Worth 2009, pet. denied).. Moreover, to be binding, the parties must have a mutual assent, or a "meeting of the minds" with respect to each of the essential terms of the contract. *2001 Trinity Funbd, LLC v. Carizzo Oil & Gas, Inc*., 393 S.W.3d 442, 449 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

37.     In this case, the essential terms of the alleged "draft" term sheet are not clear and definite, and there was no mutual assent to those terms by Kinley Ford. Among other things, the alleged draft term sheet, in addition to failing to specifically identify the parties to the contract, provides that portions of the contract are "subject to change," depending on the whims and fancies of Mr. Chandra (or an affiliated entity). *Id*. A contract subject to unilateral revisions by Mr. Chandra or one of his affiliated entities, or optional altogether, is illusory in nature, and unenforceable as a matter of law. *See Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467

S.W.3d 494, 505 (Tex. 2015) (Illusory promise is a promise that makes the promisor's performance optional).

38.     Additionally, the contract is also invalid and unenforceable because it fails for lack of consideration. Under Texas law, an enforceable contract must be based on consideration, also known as "mutuality of obligation." *Texas Gas. Utils. Co. v. Barrett*, 400 S.W.2d 409, 412 (Tex. 1970). A contract that lacks consideration is unenforceable as a matter of law. *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997). Past consideration is not sufficient to support a contract. *Stone v. Morrison & Powers*, 298 S.W. 538, 539 (Tex. Comm'n App. 1927, holding approved). Likewise, a promise to fulfill a preexisting duty is not valid consideration for a contract. *Martens v. Prairie Prod'g Co.*, 668 S.W.2d 889, 891 (Tex. App—Hpuston [14th Dist.] 1984, no writ).

39.     In this case, the only consideration offered by Mr. Chandra (or an affiliated entity) in the alleged term sheet is the existing "$1,400,000.00 (the "Initial Investment") in the form of a Secured Note from Manderbach Ford and GDM Leasing (the "Secured Note") which shall accrue and pay interest monthly on any outstanding balance at the annualized rate of eighteen percent (18%)." *See* Ex. B-12. No other consideration is identified by Mr. Chandra in the alleged term sheet. However, that consideration is already the subject of the previous December 10, 2019 Note attached hereto as Exhibit B-1. And that loan was **not** to Kinley Ford, but instead to Teton Group, Mr. Kalon and GDM Leasing, and was payable to Chandraco, not to Mr. Chandra. *See* Exhibit B-1. Thus, Texas law is clear that the previous $1.4 million loan that Chandraco made to Teton Group, Mr. Kahlon and GDM Leasing (and those borrowers repaid, at 18% interest) is not valid consideration for an agreement between Mr. Chandra and Kinley Ford. *Stone*, 298 S.W. at 539. Thus, the alleged term sheet also fails for lack of consideration.

40.     Finally, even if Mr. Chandra were able to clear all of the aforementioned legal hurdles to prove the existence of an enforceable contract between himself and Kinley Ford, the contract is also unenforceable because it violates Texas' usury laws. In Texas, contracting for, charging, or receiving interest that is greater than the statutory maximum is contrary to public policy, and creditors that charge usurious interest are subject to penalties. *See* Tex. Fin. Code §§ 302.001(c), 305.001. In general, a transaction is usurious if it is a loan of money that requires a greater interest than allowed by law. *See Bernie's Custom Coach of Tex. v. Small Bus. Admin.,* 987 F.2d 1195, 1197 (5th Cir.1993) (quoting *Myles v. Resolution Trust Corp.,* 787 S.W.2d 616, 617 (Tex.App.-San Antonio 1990, no pet. h.)). The essential elements of a usurious transaction are "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of money by the borrower." *First Bank v. Tony's Tortilla Factory, Inc.,* 877 S.W.2d 285, 287 (Tex.1994) (citing *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Express Working Capital, LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660, 665 (N.D. Tex. 2014)

41.     In this case, a review of the alleged term sheet will reveal that Teton Group, Mr. Kahlon and GDM Leasing were required to repay the $1.4 million loan to Chandraco at 18% interest – the maximum rate allowed under Texas law. Tex. Fin. Code § 303.909. Yet, in addition to receiving the maximum interest allowed by law on the loan in question, the alleged term sheet provides that the parties to the term sheet (not Kinley Ford, of course) are required to pay "additional consideration" for the $1.4 million loan, including a $600,000 "preferred return" from Manderbach Ford and/or GDM Leasing, as well as a "15% equity ownership or profits interest" in Manderbach Ford. *Id*. The Term Sheet further provided that Mr. Chandra was entitled to profits sharing, and the use of demo automobiles. *Id*. Clearly, this is an attempt by Mr. Chandra to exact

"a greater compensation than allowed by law for the use of money by the borrower." *First Bank,* 877 S.W.2d at 287. For the foregoing reasons, Mr. Chandra has no claim against Kinley Ford for breach of contract, which should be dismissed from this action.

> **2.   Mr. Chandra's cannot establish a right to declaratory relief against Kinley Ford under the federal Declaratory Judgment Act.**

42.   In his Original Petition, Mr. Chandra alleges that "[a]n actual, justiciable controversy exists between Mr. Chandra, Mr. Kahlon, and Kinley Ford regarding Mr. Chandra's 50% equity ownership in Kinley Ford," and request a declaratory judgment, declaring that Mr. Chandra "is a 50% owner of Kinley Ford and, as a result, is entitled to half of all company distributions, past, present, and future, in addition to all other benefits to which equity owners are entitled under the Kinley Ford Company Agreement."

43.   As a preliminary matter, it should first be pointed out that the request for relief that Mr. Chandra is seeking under the Texas Declaratory Judgment Act does not apply to cases removed to federal court. The Fifth Circuit has held that the Texas Declaratory Judgment Act, as codified in Chapter 37 of the Texas Civil Practice and Remedies Code, is a procedural mechanism that is inapplicable in federal court. *See Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998). Thus, in a diversity case, any declaratory judgment action must be brought under the Federal Declaratory Judgment Act. *Piazza v. Allstate Indem. Co*., 601 F. Supp. 3d 189, 195 (S.D. Tex. 2022); *Utica Lloyd's of Tex.*, 138 F.3d at 210. "When a declaratory judgment action filed in state court is removed to federal court, the federal court does not apply the Texas Declaratory Judgment Act." *Collins v. Nat'l Football League*, 566 F.Supp.3d 586, 602 (E.D. Tex. 2021) (quotation omitted); *Redwood Resort Props., L.L.C. v. Holmes Co.,* No. 3:06–CV–1022–D, 2007 WL 1266060, at *4 (N.D.Tex. Apr. 30, 2007). "When a declaratory judgment action filed in state court is removed to federal court, that action is in effect converted into one brought under the

federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202." *Redwood Resort Props., L.L.C. v. Holmes Co.,* No. 3:06–CV–1022–D, 2007 WL 1266060, at *4 (N.D.Tex. Apr. 30, 2007). Thus, at this stage, the federal Declaratory Judgment Act applies to Mr. Chandra's request for declaratory relief, not Chapter 37 of the Texas Civil Practice and Remedies Code.

44.     Second, it is well-settled under Fifth Circuit law that the Declaratory Judgment Act alone does not create a cause of action. *Harris Cnty. Tex. v. MERSCORP Inc.*, 791 F.3d 545, 552–53 (5th Cir. 2015). "In a case of actual controversy within its jurisdiction," the Declaratory Judgment Act only authorizes a federal court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). In other words, the Act "enlarged the range of remedies available in the federal courts," but it does not create a new right to seek those remedies. *Skelly Oil Co. v. Phillips Petrol. Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Walker v. City of Richardson, Tex.*, No. 3:22-CV-1164-X, 2023 WL 5024999, at *4 (N.D. Tex. Aug. 5, 2023) ("To obtain a declaratory judgment, the plaintiff must show an 'independent private right of action.'); *Okpalobi v. Foster,* 244 F.3d 405, 423 n. 31 (5th Cir.2001) ("[T]he law makes clear that—although the Declaratory Judgment Act provides a *remedy* different from an injunction—**it does not provide an additional cause of action with respect to *the underlying claim.***") (emphasis added); *Tex. Med. Ass'n v. Aetna Life Ins. Co.,* 80 F.3d 153, 158–59 (5th Cir.1996) (holding that plaintiffs were not entitled to a declaratory judgment under the Texas Uniform Declaratory Judgment Act because **they did not first identify a cause of action under the state statute that they were trying to enforce**). Such is the case here. As in the opinions cited above, in this case Mr. Chandra has no underlying claim against Kinley Ford.

45.     Specifically, the only cause of action that Mr. Chandra has asserted against Kinley Ford is that it breached the "Kinley Ford Term Sheet." *See* Plaintiff's Original Petition, Ex. A. As

set forth in paragraphs 33 through 41 above, Mr. Chandra has no cause of action against Kinley

Ford for breach of the alleged term sheet. Among other things, 1) there was no privity of contract

between Mr. Chandra and Kinley Ford; 2) the alleged term sheet was not a valid and enforceable

contract because it was illusory and failed to contain all essential and material terms with a

reasonable degree of certainty and definiteness; 3) the alleged term sheet was unenforceable as a

matter of law because it lacked consideration; and 4) the alleged term sheet violated the Texas

usury laws, and was therefore unenforceable. Where, as here, the court has (or should) dismiss the

only cause of action brought by the plaintiff, the plaintiff has asserted no independent cause of

action, and its claim for declaratory judgment should likewise be dismissed. *See Pittman v. Seterus,*

*Inc.*, No. 3:14-CV-3852-M (BF), 2015 WL 7444108, at *6 (N.D. Tex. Oct. 28, 2015), report and

recommendation adopted, No. 3:14-CV-3852-M (BF), 2015 WL 7424766 (N.D. Tex. Nov. 23,

2015) (Where the Court recommends that summary judgment be granted on all claims brought by

the plaintiff, a claim for declaratory judgment by itself does not create a federal cause of action,

and summary judgment should be granted on that claim as well).

      46.     To the extent that Mr. Chandra alleges that his request for declaratory relief will

resolve claims between himself and Kinley Ford that may arise in the future, In a declaratory-

judgment action based on anticipated litigation, the relevant cause of action  is the defendant's

anticipated lawsuit against the plaintiff. *See Collin County v. Homeowners Ass'n for Values*

*Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990) ("Since it is the underlying cause

of action of the defendant against the plaintiff that is actually litigated in a declaratory

judgment  action, a party bringing a declaratory judgment  action must have been a proper party

had the defendant brought suit on the underlying cause of action ."); *Lowe v. Ingalls Shipbuilding,*

*A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984) ("[T]he underlying cause of action

which is thus actually litigated is the declaratory defendant's, not the declaratory plaintiff's ....”); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 500 (5th Cir. 2020) (Oldham, J., concurring) (“[T]he Declaratory Judgment Act ... does not create a standalone cause of action. Rather, ... [i]t allows parties who would otherwise be defendants to seek relief as plaintiffs.”).

47.     In this case, there simply is no anticipated cause of action by Kinley Ford against Mr. Chandra related to either the alleged Kinley Ford Term Sheet, or the alleged Kinley Ford Company Agreement. For the foregoing reasons, Mr. Chandra has no claim against Kinley Ford for declaratory judgment, and such claim should likewise be dismissed.

## VII.
### NOTICE

48.     Upon filing this Notice of Removal, written notice of the following is being given by removing Defendants to the Plaintiff and his counsel as required by law.  A copy of this Notice of Removal is also being filed with the 17th District Court of Tarrant County, Texas, the Court in which this cause was originally filed.

## VIII.
### CO-DEFENDANTS’ JOINDER IN REMOVAL

49.     Petitioners have conferenced with co-defendants KinleyCo Ventures, Inc., Steven Kahlon and Kinley Ford, LLC in the underlying state court action, and KinleyCo Ventures, Inc. and Steven Kahlon have indicated they will be filing a Joinder in this Notice of Removal for Improper Joinder, and Kinley Ford, LLC has indicated it consents to this Notice of Removal for Improper Joinder.

**IX.**
**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Petitioners pray that Kinley Ford be dismissed, that the above entitled action be removed from the 17th District Court of Tarrant County, Texas, to the United States District Court for the Northern District of Texas, Fort Worth Division. Petitioners pray for such other and further relief, both at law and in equity, to which it may show themselves to be justly entitled.

Respectfully submitted,

**WHITE, STARLING & OSTERMAN, PLLC**

By: *//s// Brandon L. Starling*
      Brandon L. Starling
      State Bar No. 24047556
      Susan G. White
      State Bar No. 00788658
      2003 N. Lamar Blvd., Suite 100
      Austin, Texas 78705
      Phone: 512-559-6461
      Facsimile: 512-791-9764
      bstarling@wso-law.com
      swhite@wso-law.com

      ATTORNEY FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court, Northern District of Texas, in accordance with the Federal Rules of Civil Procedure.

*/s/ Brandon L. Starling*
Brandon L. Starling